**Junior STAMPER, Plaintiff-Appellant,**

v.

**Patricia R. HARRIS, Secretary of Health, Education and Welfare, Defendant-Appellee.**

No. 79–3510.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1981.

Decided June 1, 1981.

Frank J. Neff, Miles Gibson, Barkan, Barkan & Neff, Richard Kohn, Columbus, Ohio, for plaintiff-appellant.

James C. Cissell, U. S. Atty., Joseph E. Kane, Asst. U. S. Atty., Columbus, Ohio, Michael J. Zarski, Chicago, Ill., for defendant-appellee.

Before EDWARDS, Chief Judge, LIVELY, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

Plaintiff-appellant Stamper seeks award of social security disability benefits in an appeal from a decision by a District Judge in the Southern District of Ohio affirming denial of such benefits by the Secretary of Health, Education and Welfare.

Stamper, now 54 years old, never went beyond the third grade in school and is functionally illiterate. He is 5′8″ tall and weighs 190 pounds. After holding jobs as a farm laborer, an employee of a steel foundry and an assembler in a factory, he secured a job in the construction industry, first as a common laborer and then a cement finisher for his last employer, which job he held for 19 years. In 1971, as a result of an injury on the job, he was operated on for two herniated discs resulting in the removal of a "herniated nucleus pulposus."

Plaintiff thereafter returned to work, continuing in his prior employment up to November 1974 when, according to him, back pain forced him to quit work. He now complains of pain in the lower back and legs, of tension, irritability and inability to sleep.

Under questioning by the Administrative Law Judge (ALJ) who heard this case for the Secretary, plaintiff testified as follows:

Q Do you have pain in your legs?

A Yes.

Well, it stays numb and then the pain shoots up.

Q Both legs?

A   The right one is the main one.

Q   You are using a cane today. How long have you used a cane?

A   Well, I have been using a cane for around two years. I just got me a new one. I had an old thing but it didn't have no rubber or nothing on it.

Q   You have surgery on your back, haven't you?

A   Yes.

Q   When did you have surgery?

A   Well, about roughly a month after I was hurt.

Q   Have you had it just one time, back surgery?

A   That's all.

Q   It didn't help any?

A   Yes, it helped some. I was completely paralyzed at the time.

Q   Before the surgery?

A   Yes.

Q   You couldn't walk at all?

A   I could hardly walk at all. I did walk, you know, but I was in misery which it helped some at the time but I don't know it's just gotten worse and worse afterwards. It got better for a while and then it got worse. It started easing up and then it got worse and worse.

Q   So your condition now is about like you described it here for me, is that right?

A   Right. I am just about in the same shape I was in when to be operated on the first time.

Q   You have been operated on only once, haven't you? Have many times have you had surgery?

A   Once.

Q   What do you mean the first time?

A   The first time I was operated on.

Q   What problem do you have in walking and standing?

A   I draw and ache. My leg gives away. I don't know if I'm going to be able to stand up on it or not.

Q   You say you have fallen twice. When was that, do you remember?

A   Here about three or four months ago, I got out of the car and my picket fence is next to me my leg, I started to make a step and over I went. I fell in the fence. I got up out of bed and fell over against the wall when I started making a step.

Q   How much walking can you do or standing before this happens; your legs start to aching and drawing?

A   Oh, I'm just in pain all the time. Pain all the time, drawing, aching. I ain't had no relief.

Q   Do you have any problems with bending and kneeling?

A   Oh, yes.

Q   What happens to you?

A   Every bone in me cracks, aches and I feel like I am tearing in two.

Q   Does it bother you to sit for a long time?

A   Yes.

Q   What does it do to you?

A   I feel like, I don't know, you punched with a knife around my back and pain comes around.

Q   Back pain then?

A   Yes.

Q   Any problems with your hands or griping?

A   I ain't got nearly the grip I had.

Q   Is it strength or something else?

A   Yes.

Q   You don't have any pain in your arms do you?

A   Once in a while this one.

Q   Occasional pain in the right arm?

A   Yes.

Q   What kind of medication do you take?

A   I have some prescriptions here. I don't know I can't read one from another.

Q   This was prescribed, oh, this is not a prescription. It's a list of things you are taking, is that right?

A   Yes.

Q   You see Dr. Swanski (PHONETIC) and Dr. Kackly (PHONETIC) both do you?

A   Well, I, no Dr. Kackly is the one I started going to Kackly. I changed to go to him.

Q Well, on this it says Dr. Swanski and then it says.

A That's when I was taking that.

Q Oh, you were taking that prescribed by him?

A Yes.

Q What you are taking now is these three from Dr. Kackly?

A Yes, he wanted to change me on my medications.

Q Dr. Swanski was giving you Soma and Perkidin (PHONETIC) for pain, Dalmane 30 for sleep and Albunthe (PHONETIC) for nerves. You are now taking from Dr. Kackly Fiorinal caps, Soma and Nembutal. Is that right, sir?

A Yes.

Q Do you have any side effects from that medication?

A Pardon?

Q Do you know what a side effect is? Does the medication make you sick in any way or affect you, make you sleepy or drowsy.

A It makes you sleepy and drowsy.

Q Is Dr. Kackly your only treating physician now?

A Yes.

We recognize, of course, that the claimant's testimony about pain is not conclusive evidence of disability, but it is certainly admissible in relation to this claim. Further, plaintiff's complaints of pain are not contradicted and the examining physicians' reports of record show "an underlying medical basis" for this pain. *See Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The report of Dr. D. D. Kackly, plaintiff's treating orthopedic physician, stated:

I examined Mr. Stamper in the office on December 15, 1977. He continues to complain of disabling low back and lower extremity symptoms and has not been able to carry out any significant or regular work activity since shortly after his injury in 1971.

Patient is markedly restricted in all activity at home. He is required to spend a considerable amount of time in bed because of persistent back and right lower extremity symptoms. He does experience intermittent loss of control of the right leg and has fallen on numerous occasions because of this. He also has considerable difficulty resting more than a few hours at a time and has marked pain and stiffness when arising in the morning.

On examination there is generalized tightness and loss of flexibility of the lumbar spine. I can demonstrate no marked neurological deficit other than some generalized sensory impairment over the right thigh and lower leg area and some suggestive weakness of the great toe extensor on the right side. His x-rays show rather marked degenerative involvement of the entire lumbar area as well as laminectomy at the L5 level on the right.

I feel this patient represents a fairly typical picture of chronic low back decompensation secondary to progressive spinal stenosis. Some of these changes are the result of progressive degenerative involvement throughout the lumbar area with aggravation as the result of injury and some of these changes may be a part of the postoperative changes frequently seen in this area.

At the present time *this patient is not capable of any significant sustained activity* that would permit him to be considered for any type of work. On this basis I would feel *he must be considered as permanently and totally disabled at this time.*

(Emphasis added.) In addition, Dr. Robert R. Kessler, who examined plaintiff on January 30, 1975 at the request of plaintiff's attorney, reported:

The prognosis for the future is poor.... Because of the findings, it is evident that [plaintiff] would be unable to engage in any type of sustained remunerative industrial activity. Because of this, I feel that *he is permanently and totally disabled.*

(Emphasis added.)

Dr. R. J. Hansell (who examined plaintiff in 1973, apparently at the request of Ohio

Workers' Compensation authorities) concluded that plaintiff suffered "permanent partial disability of 30%." Dr. Edward Butler, who examined plaintiff on July 8, 1976 at the request of the Ohio Bureau of Disability Determination, opined that plaintiff "should be capable of light work" despite his back problems.

The ALJ and the District Judge appear to agree that plaintiff is disabled from performing his previous occupation as a cement finisher. Both found no psychiatric disability and each relied primarily upon the testimony of a vocational expert in denying benefits. In response to a long hypothetical question stated by the ALJ, the vocational expert gave his opinion that plaintiff could not do any of his former work but gave examples of sedentary types of work that he could perform: "cam press operator, a bellow molder, a fuse tipper, bellow cutter, bellow repair person.... In the glove industry, there would be sedentary work primarily as a sorter, a packager, a pair labeler."

In *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980), this court pointed out four legal propositions to be applied in social security disability benefits cases:

1. The burden of proof in a claim for Social Security benefits is upon the claimant to show disability which prevents her from performing any substantial gainful employment for the statutory period. Once, however, a prima facie case that claimant cannot perform her usual work is made, the burden shifts to the Secretary to show that there is work in the national economy which she can perform. *Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978); *Garrett v. Finch*, 436 F.2d 15, 18 (6th Cir. 1970).

2. Convincing proof, consisting of lay testimony supported by clinical studies and medical evidence, that pain occasions a claimant's inability to perform his or her usual work is sufficient to make a prima facie case. *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383 (6th Cir. 1978); *Noe v. Weinberger*, 512 F.2d 588 (6th Cir. 1975).

3. In determining the question of substantiality of evidence, the reports of physicians who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim. *Whitson v. Finch*, 437 F.2d 728, 732 (6th Cir. 1971); see also *Giddings v. Richardson*, 480 F.2d 652 (6th Cir. 1973).

4. Substantiality of the evidence must be based upon the record taken as a whole. *Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973).

Employing these same standards in reviewing the record before us, we agree that plaintiff Stamper is clearly disabled from his previous employment as a cement finisher as a result of the back injury and its sequelae. In this posture of the case, the burden falls upon the Secretary to show that there is work in the national economy which plaintiff can perform.

We observe that plaintiff's treating physician (and one other) found him totally and permanently disabled, while a physician who examined plaintiff solely at the request of state governmental authorities reported that he "should be capable of light work." We also note that a treating physician's opinion "is entitled to weight substantially greater than that of a doctor who has seen the claimant only once." *Hephner v. Mathews, supra*, at 362, citing *Allen v. Weinberger*, 552 F.2d 781, 786 (7th Cir. 1977); *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). See also *Allen v. Califano, supra*, at 145.

We believe that the Secretary failed to afford the opinion of plaintiff's treating physician the substantial weight to which it is entitled. Moreover, we hold that the vocational expert's testimony, upon which the ALJ, the HEW Appeals Council, and the District Court primarily relied, does not in the context of this case constitute sub-

stantial evidence to support the denial of benefits.

The vocational expert testified that there were light assembly jobs available in the national economy which plaintiff's post-injury residual strength was adequate to perform. We take judicial notice that 19 years of heavy work in the construction industry does not prepare a person to perform light assembly work. The ALJ and vocational expert utterly ignored the fact that the basic human tools required for light assembly work are flexible fingers, speed in performance, and the ability to learn the jobs. We assume that no ALJ or vocational expert would suggest that plaintiff had residual capacity for substantial gainful employment as a pianist because he retained the physical capacity to sit for two hours at a concert piano bench and strike some keys.

Such omissions in the record would require remand for rehearing, absent the Secretary's implied concession that plaintiff is disabled as far as his previous employment is concerned, thus placing the burden on the Secretary to prove that plaintiff retains the capacity for substantial gainful employment. The Secretary has failed to meet this burden.

The judgment of the District Court is vacated. The case is remanded to the District Court for remand to the Secretary for granting of benefits.